## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

HELPING HAND CAREGIVERS LTD.,　)
an Illinois corporation, individually and　)
as the representative of a class of　)
similarly-situated persons,　)
　)
　　　　Plaintiff,　)　　No. 14-cv-10127
　)
v.　)　　Hon. Manish S. Shah
　)
DARDEN RESTAURANTS INC., et al.,　)
　)
　　　　Defendants.　)

## PLAINTIFF'S RESPONSE TO DARDEN'S STATEMENT OF MATERIAL FACTS

Plaintiff, Helping Hand Caregivers, Ltd. ("Plaintiff"), has been deprived of the opportunity to depose two witnesses who worked at Defendant Darden Restaurants, Inc. ("Defendant" or "Darden") at times relevant to this litigation who have relevant information and who are described in Darden's Statement of Facts. Where those witnesses, Kasha Momot and Roberto Sanchez, may have knowledge creating a material dispute of fact in response to Darden's statement of facts, Plaintiff denies those facts but has acknowledged when those facts are not contradicted by existing evidence. Subject to the foregoing and pursuant to Local Rule 56.1, Plaintiff respectfully submits its Response to Defendant Darden Restaurants, Inc.'s Statement of Uncontested Material Facts [DE 68] as follows:

## I.　DESCRIPTION OF THE PARTIES

1.　Plaintiff Helping Hand Caregivers, Ltd. ("Helping Hand") is a dissolved Illinois corporation with former principal place of business in Lake County, Illinois. (Exhibit A, Illinois Secretary of State Corporation File Detail

Report; DE #36 at ¶8). Helping Hand was voluntarily dissolved on October 21, 2015. (Ex. A).

**RESPONSE**: Admitted.

2.     Defendant Darden Restaurants, Inc. ("Darden") is a Florida corporation with its principal place of business in Orange County, Florida. (DE #37 at ¶9). Darden owns certain Olive Garden trademarks. (Exhibit E, Darden's Complaint against Helping Hand, Exhibit A thereto).

**RESPONSE**: Admitted.

3.     Defendant Mid Wilshire Consulting, Inc. d/b/a Social Wellness ("Social Wellness") is a California corporation with its principal place of business in Los Angeles County, California. (DE #36 at ¶10).

**RESPONSE**: Admitted.

4.     Defendant Brian J. Kang ("Kang") is a resident of Santa Clara County, California. (DE #36 at ¶11).

**RESPONSE**: Admitted.

5.     Defendant Greg M. Jones ("Jones") is a resident of Los Angeles County, California. (DE #36 at ¶12).

**RESPONSE**: Admitted.

6.     While named as defendants in this action, Defendants Social Wellness, Kang, and Jones have not appeared in this action and Helping Hand has not pursued default judgments against these defendants. (*See, generally*, Docket).

**RESPONSE**: Admitted.

## II.     THE ROLE OF KANG AND JONES WITH SOCIAL WELLNESS

7.     Kang is the CEO of, and owns, Social Wellness. (Exhibit C, Kang Deposition, 11:14-19). Kang is Social Wellness' only employee. (*Id.* at 14:25-15:2).

**RESPONSE**: Admitted.

8.     Jones is an independent contractor for Social Wellness. (Exhibit B, Jones Deposition, 9:16-9:23; Ex. C, Kang Deposition, 62:7-13).

**RESPONSE**: Admitted.

9.     In his role as independent contract for Social Wellness, Jones does "side jobs," "mechanic work," and "help[s] Social Wellness out." (Ex. B, Jones Deposition, 9:18-23).

**RESPONSE**: Denied because it misstates Jones' testimony. Admitted that as of May 10, 2016, Jones worked "side jobs," including "mechanic work." Jones Deposition at 9:19-21. As pertains to Social Wellness, as of May 10, 2016, Jones "help[ed] them out all the time." *Id.* at 9:22-23. Jones' original work at Social Wellness included "sign[ing] up people to help answer phone calls that were coming in" and increasing response to the Social Wellness program by creating "brand recognition." *Id.* at 93:24-95:3. Kang testified that the work Jones performed for Social Wellness included creating marketing flyers and deciding how the "marketing flyers" would be sent, e.g., by e-mail, fax or otherwise. Deposition of Brian Kang, June 1, 2016, at 10:19-11:2, 29:15-29, 30:4-10, 32:19-25, 34:15-22, 59:10-12.

## III.   JONES' LIMITED COMMUNICATIONS WITH DARDEN

10.     Kang never spoke to anyone at Darden. (Ex. C, Kang Deposition, 13:18-19, 14:1-4, 69:21-24). All of Social Wellness' communications with Darden were through Jones. (*Id.* at 13:18-19, 14:1-4, 69:25-70:2; Exhibit D, Bott Deposition, 37:24-38:1).

**RESPONSE**: Denied to the extent that this statement of fact conflicts with SOF ¶ 59, stating that Kang communicated with counsel for Darden, and denied insofar as Kasha Momot ("Momot") or Roberto Sanchez ("Sanchez") may have contrary testimony. Plaintiff acknowledges that, based on current, limited discovery, it has no evidence that Kang ever spoke to anyone at Darden and that,

based on current, limited discovery, Jones was the only person associated with Social Wellness who communicated directly with Social Wellness.

11.     Jones first communicated with Darden in July 2014 by sending an unsolicited message through Olive Garden's website. (Ex. B, Jones Deposition, 15:17-16:3, Jones Deposition Exhibit 3).

**RESPONSE**:  Admitted that Jones first contacted Darden via e-mail through a link on Olive Garden's website. Jones Deposition at 15:21-16:3, Ex. 3. Plaintiff denies the remaining allegations.

12.     The email message requested that Olive Garden consider a strategic alliance with Social Wellness.  (Ex. B, Jones Deposition Exhibit 3).

**RESPONSE**: Exhibit 3 to the Jones Deposition (Darden 1-2) speaks for itself. Plaintiff denies any allegations inconsistent with the document.

13.     During the course of his communications with Darden, Jones only spoke to two people about a potential strategic alliance: Kasha Momot ("Momot") and Ken Bott ("Bott"). (Ex. B, Jones Deposition, 16:7-19).

**RESPONSE**:  Denied. Jones and Roberto Sanchez had a telephone conversation on or about October 22, 2014. Jones Deposition at 52:20-53:2. Sanchez had been apprised of the Social Wellness lunch n' learn program through internal emails at Darden. Bott Deposition at 119-120, Ex. 15 (Darden 89), 63:24-25, Ex. 23 (Darden 164-65), Darden 191-97.

14.     Bott is employed by Darden as the Director of Commerce Programs and Partnerships.  (Ex. D, Bott Deposition, 6:18-22).

**RESPONSE**: Admitted.

15.     Momot was formerly a Darden employee and was the Director of Brand Management. (Ex. D, Bott Deposition, 24:19-25, 110:7-10).

**RESPONSE**: Admitted.

16.     Jones only spoke with Momot once or twice and never met with Momot in person. (Ex. B, Jones Deposition, 19:1-5, 19:3-4).

**RESPONSE**: Admitted that Jones spoke by telephone with Momot and never met with Momot in person. Otherwise denied. Jones testified that he spoke with Darden "between three and five" times up to September 4, 2014 (the time when Kasha was still employed by Darden), but that "[t]he other phone calls may have been a couple of minutes long, looking for Kasha. Just not as very long and in-depth as the one big phone call that we had." Jones Deposition at 37:7-11, 38:10-16. In addition to speaking by telephone, Jones and Momot exchanged at least ten (10) emails. Jones Deposition, Exs. 4-13.

17.     Jones likewise never met with Bott in person. (Ex. B, Jones Deposition, 41:13-14).

**RESPONSE**: Admitted.

18.     Leading up to September of 2014, Jones only had between three and five calls with Darden. (Ex. B, Jones Deposition, 37:7-15).

**RESPONSE**:    Denied insofar as Momot or Sanchez may have contrary testimony. Plaintiff acknowledges that, based on current, limited discovery, it does not possess contrary evidence and admits that Jones testified that when asked how many telephone calls he had with Darden up to September 4, 2014, he replied, "I want to say between three and five." Jones Deposition at 37:10-11. Denied as to the remaining allegations.

19.     The emails used as exhibits during Jones' deposition (Jones Deposition Exhibits 3-32) represent every email between Jones and Darden. (Ex. B, Jones Deposition, 82:17-20).

**RESPONSE**: Admitted.

## IV. SOCIAL WELLNESS NEVER DISCUSSED FACSIMILES WITH DARDEN, ONLY EMAILS

20.     Jones' idea was for Darden to allow Social Wellness to use the Olive Garden logo to help promote Social Wellness' program.  (Ex. B, Jones Deposition, 20:14-19).

**RESPONSE**:  Admitted only that Jones wanted to "have Olive Garden or Dardens [sic] allow Social Wellness to market – you know, to use their logo to market their [Social Wellness'] program." Jones Deposition at 20:15-19. Otherwise denied, because Jones' idea was broader. Jones also testified that in discussions with Darden, he explained that, "Social Wellness and Olive Garden could work together" and the parties discussed "if it were a good idea or not." Jones Deposition, 22:18-20. Jones told Bott that Social Wellness could benefit Olive Garden's catering business:  "It was through catering purchases for the volunteers for the companies. The doctors would preorder a certain amount of meals for whoever they were doing this program for, for the companies." *Id.* at 45:8-17. The doctors, in fact, did order catered food from Olive Garden. *Id.* at 46:23-47:1, 71:20-23.

21.     But the <u>only</u> thing Jones ever discussed with anyone at Darden was the sending of emails.  (Ex. B, Jones Deposition, 80:24-81:1).

**RESPONSE**:  Denied. Jones discussed many things with Darden, including a "business opportunity" between the two companies (Bott Deposition at 81:18-23), a "strategic partnership," (*id.* at 109:2), and ordering food from Olive Garden to provide at Social Wellness lunch n' learn programs (Bott Deposition at 14:17-23). In addition, Momot and Sanchez may have contrary testimony that would create a

dispute of material fact, but Plaintiff was precluded from deposing these witnesses. *See* Bott Deposition at 89:18-19 ("I don't know what other conversations may have been had between Kasha [Momot] and Greg [Jones].").

22.     Jones described Social Wellness' proposed plan as sending emails in a test area to see if there would be interest in Social Wellness' program. (Ex. B, Jones Deposition, 24:18-24:22).

**RESPONSE**:  Admitted that Jones testified that he discussed conducting "an e-mail marketing campaign in a test area to try to see if there would be interest in their program." Jones Deposition at 24:18-22. But denied to the extent this statement limits the scope of Jones' plan, which included benefits to Olive Garden and its new catering business: "It was through catering purchases for the volunteers for the companies. The doctors would preorder a certain amount of meals for whoever they were doing this program for, for the companies." Jones Deposition at 45:8-17. The doctors, in fact, did order catered food from Olive Garden. *Id.* at 46:23-47:1, 71:20-23. Jones also requested that Olive Garden put its own resources into marketing the Social Wellness program. *Id.* at 86:10-21, Ex. 27.

23.     Jones' anticipated result of the email test was the hope that companies would be interested in Social Wellness, would contact Social Wellness, and would enroll in Social Wellness' program.  (Ex. B, Jones Deposition, 50:7-20).

**RESPONSE**: Admitted that Jones hoped "that companies would be interested in wellness," contact Social Wellness and enroll in Social Wellness' program. Jones Deposition at 50:7-20. But denied to the extent this statement limits the scope of Jones' hopes for the email test. Jones also hoped that if the test were successful, Olive Garden would "help out by launching a commercial or putting something in

their stores." Jones Deposition at 86:10-19, Ex. 27.

24.     Sometime between September 8, 2014 and October 10, 2014, Jones believes he had a call with Bott where he explained Social Wellness' program in more detail.  (Ex. B, Jones Deposition, 42:20-43:18).

**RESPONSE**: Admitted.

25.     Jones spoke only about the sending of emails and again described generally a test wherein Social Wellness would send emails to a test market and let the consumer know from whom the food was going to be purchased.  (Ex. B, Jones Deposition, 43:19-22, 44:10-44:18).

**RESPONSE**: Admitted that during the phone call, Jones "explain[ed] the program to him [Bott] in more detail" and intended to give Bott "an idea of how Social Wellness was going to start marketing," including sending emails to a test market. Jones Deposition at 43:4-18, 44:10-18. But denied as an incomplete description of the subject matter discussed. During the phone call, Jones and Bott also discussed how Social Wellness' program could benefit Olive Garden's catering business. Jones Deposition 45:8-17. Jones recalls Bott assenting to Social Wellness' marketing proposal:  "We have no problem with your telling your companies where the food is coming from." *Id.* at 84:22-23; *see generally* 83:14-85:6.

26.     Jones, however, never sent Darden a mock-up email with Olive Garden's logo and Darden never approved any such email. (Ex. B, Jones Deposition, 82:17-82:24, 93:13-18).

**RESPONSE**: Admitted that Jones did not provide Darden with a mock-up email containing Olive Garden's logo. Denied as to the remaining allegations. Darden did not ask for a mock-up email with Olive Garden's logo. Darden first requested that Jones "share a copy of your marketing materials (how would Olive

Garden name / logo be used)" (Jones Deposition, Ex. 8, Darden00073) and then requested a "sample email" (*Id.*, Ex. 11, Darden000131). In response, Jones provided Darden with a sample "marketing piece" to illustrate the type of marketing Social Wellness was proposing. *Id.*, 27:8-11 ("Q. So you sent her a copy of your marketing materials? A. I sent her a copy of the e-mail that we would – that Social Wellness would be using."), Ex. 12, Darden000137, Darden000143 ("I have attached a marketing piece that we currently use so you get an idea of what it looks like. The message and graphics can be edited or changed in any way Olive Garden would like, as long as it represents the correct message."). Darden provided verbal assent for Social Wellness to use the Olive Garden logo on marketing materials. *Id.* at 93:12.

27.    During the course of all conversations with Darden, Jones <u>never once</u> discussed the sending of faxes.  (Ex. B, Jones Deposition, 80:20-81:1, 103:4-7).

**RESPONSE**:  Denied insofar as Momot and Sanchez may have contrary testimony that would create a dispute of material fact. *See* Bott Deposition at 89:18-19 ("I don't know what other conversations may have been had between Kasha [Momot] and Greg [Jones]."). Based on current, incomplete discovery, Plaintiff admits that Jones testified that he only discussed email marketing as a specific example of the type of marketing he envisioned conducting with Darden.

28.    Darden and Olive Garden had nothing to do with the sending of the fax to Helping Hand.  (Ex. B, Jones Deposition Exhibit 35).

**RESPONSE**: Denied. Darden assented to Social Wellness using the Olive Garden logo on marketing material to inform recipients what food would be served

at the lunch n' learn programs. Jones Deposition, 83:14-85:6, 93:12. After several months of discussing a joint marketing campaign, Darden agreed that Social Wellness could send test marketing to consumers that would inform consumers about the Social Wellness lunch n' learn events that would serve food from Olive Garden. *Id.* at 44:15-45-17; *see also* Ex. 8 ("Testing would make sense."). Darden also benefitted through the sales of catered Olive Garden food. Bott Deposition at 176:9-17. Exhibit 35 to the Jones Deposition lacks foundation and is inadmissible. Jones testified that he did not have any role in drafting Exhibit 35. Jones Deposition at 89:17-18, 90:13-14. Kang could not recall whether he or Jones sent the email contained in Exhibit 35, as they both had access to the same Social Wellness email accounts. Kang Deposition at 47:10-12, 71:18-72:16, Ex. 7. Kang testified that he spoke with counsel for Darden and "whatever you guys asked, I did." *Id.* at 46:5-7. Moreover, Kang has no knowledge of Jones' communications with Darden. *Id.* at 26:18-19 ("I don't know. I didn't – Greg spoke to them. So I don't know."); 58:17-21, 69:21-23, 71:6-15.

## V.    DARDEN'S BUSINESS PRACTICES

29.    If Darden enters into a partnership with a company, Darden's business practice is to enter into written contractual agreements with the company. (Ex. D, Bott Deposition, 153:15-23). Darden has a structured contractual process. (Ex. D, Bott Deposition, 166:17-167:13).

**RESPONSE**:    Denied because this statement mischaracterizes Bott's testimony. With regards to a "written policy," Bott testified as to his understanding that, "[Darden has] contract language agreements. If there's partnerships transpire [sic], then there's paperwork – there's a master services agreement that's typically

put together that has usage of a logo, expectations of their relationship, indemnity, to all of the other kind of traditional term, all of that type of language." Bott Deposition at 153:18-23.

With regards to the steps in creating a partnership with Darden, Bott testified as to his understanding:

> "There would have been agreements drafted, timelines put together, memorialized within a statement of work. It would have been appended to the master services agreement with expectations that would be set for what would be delivered upon on both parties' side. We would most definitely have signed an NDA with them before we even got into contracts, and there's no NDA signed with them as far as I'm aware. So anything that was shared with them was public knowledge that could be accessed by anyone in the marketplace, so there's nothing proprietary to the conversation, therefore we didn't feel like we needed to be protected there.
>
> The contracts are something that Darden, as an organization, is very structured around. So the process is you go through the business evaluation and the brand fit, if it doesn't make sense – it's kind of a staged gaining process, and if you don't get to an NDA, you haven't even made the first cut. And then the contracting component of it comes after that. So they didn't even make it past the first cut."

*Id.* at 166:19-167:13.

30.    Prior to even entering into a contract, Darden requires the companies with whom it partners to execute a non-disclosure agreement. (Ex. D, Bott Deposition, 166:17-167:13).

**RESPONSE**: Denied because this statement mischaracterizes Bott's testimony. Bott testified as to his understanding:

**Q**    So if you had – if Darden had partnered with Social Wellness, what would have been the next steps?

**A**  There would have been agreements drafted, timelines put together,

memorialized within a statement of work. It would have been appended to the master services agreement with expectations that would be set for what would be delivered upon on both parties' side. We would most definitely have signed an NDA with them before we even got into contracts, and there's no NDA signed with them as far as I'm aware. So anything that was shared with them was public knowledge that could be accessed by anyone in the marketplace, so there's nothing proprietary to the conversation, therefore we didn't feel like we needed to be protected there."

Bott Deposition, 166:17-167:5.

31.     Darden then requires the execution of a master services agreement that expressly delineates acceptable usage of the Olive Garden logo, indemnification, and expectations about the relationship. (Ex. D, Bott Deposition, 153:15-23, 166:17-167:13).

**RESPONSE**:  Denied because Darden assented to Social Wellness' use of the Olive Garden logo without requiring a master services agreement to be signed. Jones Deposition, 83:14-85:6, 93:12. Also, denied because this statement mischaracterizes Bott's testimony. With regards to his understanding of a master services agreement, Bott testified that, "[Darden has] contract language agreements. If there's partnerships transpire [sic], then there's paperwork – there's a master services agreement that's typically put together that has usage of a logo, expectations of their relationship, indemnity, to all of the other kind of traditional term, all of that type of language." Bott Deposition at 153:18-23.

With regards to his understanding of sharing proprietary information, Bott testified:

"There would have been agreements drafted, timelines put together, memorialized within a statement of work. It would have been appended to the master services agreement with expectations that

would be set for what would be delivered upon on both parties' side. We would most definitely have signed an NDA with them before we even got into contracts, and there's no NDA signed with them as far as I'm aware. So anything that was shared with them was public knowledge that could be accessed by anyone in the marketplace, so there's nothing proprietary to the conversation, therefore we didn't feel like we needed to be protected there.

The contracts are something that Darden, as an organization, is very structured around. So the process is you go through the business evaluation and the brand fit, if it doesn't make sense – it's kind of a staged gaining process, and if you don't get to an NDA, you haven't even made the first cut. And then the contracting component of it comes after that. So they didn't even make it past the first cut."

*Id.* at 166:19-167:13.

32.    Appended to the master services agreement is a statement of work memorializing timelines and setting forth exactly what work is to be delivered by both parties. (Ex. D, Bott Deposition, 166:17-167:13).

**RESPONSE**:    Denied because this statement mischaracterizes Bott's

testimony. With regards to Bott's understanding of a statement of work, Bott

testified:

"There would have been agreements drafted, timelines put together, memorialized within a statement of work. It would have been appended to the master services agreement with expectations that would be set for what would be delivered upon on both parties' side. We would most definitely have signed an NDA with them before we even got into contracts, and there's no NDA signed with them as far as I'm aware. So anything that was shared with them was public knowledge that could be accessed by anyone in the marketplace, so there's nothing proprietary to the conversation, therefore we didn't feel like we needed to be protected there.

The contracts are something that Darden, as an organization, is very structured around. So the process is you go through the business evaluation and the brand fit, if it doesn't make sense – it's kind of a

staged gaining process, and if you don't get to an NDA, you haven't even made the first cut. And then the contracting component of it comes after that. So they didn't even make it past the first cut."

Bott Deposition at 166:19-167:13.

33.     Under Darden's business practice, Bott cannot grant authorization for the use of the Olive Garden logo without: (1) having senior management sign-off; (2) the parties' entering into a non-disclosure agreement; and (3) the parties entering into a master services agreement. (Ex. D, Bott Deposition, 167:14-168:4).

**RESPONSE**: Denied. Bott did authorize the use of the Olive Garden logo. Jones Deposition at 25:4-6, 44:2-7, 83:14-84:23; Bott Deposition at 47:5-11 (admitting he understood that Jones was asking to use the Olive Garden logo). Also denied because this mischaracterizes Bott's testimony. Bott testified that his understanding of authorizing a business to use Olive Garden's logo:

> I can't give someone the right. I have to go up the – up the hierarchy and get my boss to sign off. No different than Kasha would have had to have had her boss sign off. Roberto, as well. Right, everything goes up to the senior management within the organization to make sure, A, there's an NDA; B, there's a contract, before we even look at how they use the logo and sign off on that usage. So that's – those are kind of table stakes in any of our agreements, our partnerships with any company.

Bott Deposition at 167:20-168:4.

34.     As a business practice, Darden does not market via fax. (Ex. D, Bott Deposition, 169:12-15).

**RESPONSE**: Denied because this mischaracterizes Bott's testimony. Bott testified that it was his understanding that sending faxes is not a "brand fit" for Darden, and so Darden generally does not market via fax. Bott Deposition at 142:2-4, 169:12-15. Darden, however, does not have a written policy that forbids

14

marketing via fax and Bott admitted, "in fairness, there may be some individual restaurants that are using faxes to opted-in recipients of offers in a local area . . . But as a corporation, it's not where consumers that they want to attract are receiving their communications." *Id.* at 173:19-174:2.

## VI. SOCIAL WELLNESS LACKED AUTHORIZATION TO SEND ANY FAXES ON BEHALF OF DARDEN

35. Jones never discussed faxing with anyone at Darden. (Ex. B, Jones Deposition, 80:20-23; Ex. D, Bott Deposition, 169:2-11, 169:20-23).

**RESPONSE**: Denied insofar as Momot and Sanchez may have contrary testimony that would create a dispute of material fact, but Plaintiff has been denied the opportunity to depose these witnesses. *See* Bott Deposition at 89:18-19 ("I don't know what other conversations may have been had between Kasha [Momot] and Greg [Jones]."). However, Plaintiff admits that Jones testified that the only specific advertising medium he discussed during the several months of discussion with Darden was email marketing. Jones Deposition at 24:12-17. Jones' told Darden that "Social Wellness would do an e-mail marketing campaign in a test area to see if there would be interest in their program." *Id.* at 24:18-22. Darden did not, however, restrict the marketing to emails only, or forbid Social Wellness from sending advertising faxes. *Id.* at 43:19-44:7.

36. No one at Darden ever told Jones that Social Wellness could fax anything on behalf of Darden. (Ex. B, Jones Deposition, 81:8-12; Ex. D, Bott Deposition, 169:4-7).

**RESPONSE**: Denied insofar as Momot and Sanchez may have contrary testimony that would create a dispute of material fact and Plaintiff has been

precluded from deposing these witnesses. *See* Bott Deposition at 89:18-19 ("I don't know what other conversations may have been had between Kasha [Momot] and Greg [Jones]."). Plaintiff admits that Jones testified that although he often discussed a joint marketing program generally, without specifying the medium, the only specific advertising medium referred with Darden was email marketing. Jones Deposition at 24:12-17. Moreover, no one at Darden told Jones he could <u>not</u> use the Olive Garden name or logo or send marketing materials by fax. Jones Deposition at 25:4-6, 43:25-44:-7; Bott Deposition at 47:5-11. Instead, Bott allowed Jones to inform prospective lunch n' learn attendees that the food at the events came from Olive Garden. Jones Deposition at 83:14-84:23.

37.    No one at Darden ever wrote Jones that Social Wellness could fax anything on its behalf. (Ex. B, Jones Deposition, 82:17-20, Jones Deposition Exhibits 3-32).

**RESPONSE**: Admitted.

38.    Social Wellness never entered into any contractual relationship with Darden. (Ex. C, Kang Deposition, 70:7-9).

**RESPONSE**: Denied. This is not a statement of fact but instead calls for a legal conclusion. To the extent an answer is required, Plaintiff admits that Kang, who is not a lawyer, testified that Social Wellness did not enter into a contractual relationship with Darden. Kang Deposition at 70:7-11.

39.    Social Wellness never entered into a non-disclosure agreement with Darden. (Ex. C, Kang Deposition, 71:3-5).

**RESPONSE**:  Admitted that, based on current, limited discovery, there is no evidence that Social Wellness and Darden signed a non-disclosure agreement.

40.     Social Wellness never entered into a master services agreement with Darden. (Ex. C, Kang Deposition, 70:13-16).

**RESPONSE**:   Admitted that there is no evidence that Social Wellness and Darden signed a master services agreement.

41.     Social Wellness never entered into a licensing agreement with Darden. (Ex. C, Kang Deposition, 70:17-20).

**RESPONSE**:   Admitted that there is no evidence that Social Wellness and Darden signed a master services agreement.

42.     Social Wellness never entered into a statement of work with Darden. (Ex. C, Kang Deposition, 70:25-71:2).

**RESPONSE**:   Admitted that there is no evidence that Social Wellness and Darden entered into a formal statement of work.

43.     Darden never paid any money to Social Wellness. (Ex. C, Kang Deposition, 69:9-11).

**RESPONSE**:   Admitted.

44.     Social Wellness never paid any money to Darden. (Ex. C, Kang Deposition, 69:12-14).

**RESPONSE**: Admitted that Social Wellness never paid any money to Darden but denied to the extent that this statement omits the fact that Darden benefitted from Social Wellness' marketing program, through which doctors did order catered food from Olive Garden. Jones Deposition at 46:23-47:1, 71:20-23.

45.     Bott was neither provided nor saw the materials Social Wellness used. (Ex. D, Bott Deposition, 72:6-8).

**RESPONSE**:   Denied. Jones emailed Momot and Bott a sample "marketing piece" to illustrate the type of marketing Social Wellness was proposing. Jones

Deposition at 27:8-11 ("Q. So you sent her a copy of your marketing materials? A. I sent her a copy of the e-mail that we would – that Social Wellness would be using."), Ex. 12, Darden000137, Darden000143 ("I have attached a marketing piece that we currently use so you get an idea of what it looks like. The message and graphics can be edited or changed in any way Olive Garden would like, as long as it represents the correct message.")

46.     Bott never saw the fax at issue outside the context of this litigation. (Ex. D, Bott Deposition, 168:20-169:3).

**RESPONSE**: Admitted.

47.     Bott never gave anyone at Social Wellness permission to send a fax bearing the Olive Garden logo.  (Ex. D, Bott Deposition, 169:4-7).

**RESPONSE**: Denied. Jones testified that "Ken Bott told me it was okay" to use the Olive Garden logo. Jones Deposition at 83:14-19. "He said, 'If you want to tell your companies where the food's coming from, that's okay.' " *Id.* at 83:22-23. Jones recalls Bott assenting to Social Wellness' marketing proposal: "We have no problem with your telling your companies where the food is coming from." Jones Deposition at 84:22-23; *see generally* 83:14-85:6

48.     Darden never gave Social Wellness permission to use the Olive Garden name or logo in any of Social Wellness' materials.  (Ex. D, Bott Deposition, 168:5-19).

**RESPONSE**: Denied insofar as Momot and Sanchez may have contrary testimony that would create a dispute of material fact. *See* Bott Deposition at 89:18-19 ("I don't know what other conversations may have been had between Kasha [Momot] and Greg [Jones]."). Moreover, Bott gave Jones explicit permission to use

the Olive Garden name or logo in Social Wellness' marketing materials. Jones Deposition at 83:14-85:6.

## VII. SOCIAL WELLNESS WAS SOLELY RESPONSIBLE FOR THE CREATION AND SENDING OF THE FLYER

49.     Helping Hand alleges it received the flyer at issue via fax on October 31, 2014. (DE #36, ¶16).

**RESPONSE**: Admitted.

50.     The flyer was created by someone Kang and Jones found on Craigslist using Photoshop.  (Ex. C, Kang Deposition, 10:16-11:7).

**RESPONSE**:  Admitted that the flyer was created by someone Kang and Jones found on Craigslist.

51.     Social Wellness obtained the Olive Garden logo used in the flyer from the internet. (Ex. B, Jones Deposition, 78:15-20; Ex. C, Kang Deposition, 13:4-11, 69:15-20).

**RESPONSE**: Denied to the extent this statement mischaracterizes the testimony. Jones testified, "I think that Social Wellness took it from the website, but I'm not sure." Jones Deposition at 78:19-20. The Kang deposition testimony reads:

**Q.** And how did the Craigslist designer you hired get the Olive Garden logo in the top right corner?

**A.** I think we gave it. We gave it to them.

**Q.** Where did you get it?

**A.** I think Google. (13:4-9)

52.     Social Wellness obtained the picture of food used in the flyer from either Google or "like one of those website companies where you can buy pictures." (Ex. C, Kang Deposition, 13:12-17).

19

**RESPONSE**: Denied to the extent this statement mischaracterizes the testimony. Jones testified he did not know if it was Olive Garden's food displayed on the fax. Jones Deposition at 68:5-9. Kang's deposition testimony reads:

**Q.** Okay. What about this picture at the bottom of the food?

**A.** Same thing. Just Google. Yeah.

**Q.** Google? Okay.

**A.** It was either Google or like one of those website companies where you can buy pictures. (13:12-17).

53. The contact information in the flyer, including the contact email and phone number, belong to Social Wellness. (Ex. C, Kang Deposition, 12:16-25).

**RESPONSE**: Admitted.

54. Social Wellness gathered the fax numbers either by using Google or by buying "a list off of Craigslist from some lady." (Ex. C, Kang Deposition, 66:15-25).

**RESPONSE**: Admitted.

55. The flyer was sent by Social Wellness using Westfax. (Ex. C, Kang Deposition, 23:2-7).

**RESPONSE**: Admitted.

VIII. <u>UPON LEARNING OF THE FAX, DARDEN IMMEDIATELY SENT A CEASE AND DESIST LETTER AND SOCIAL WELLNESS CONTINUED TO USE THE OLIVE GARDEN MARK WITHOUT AUTHORIZATION</u>

56. Helping Hand filed the instant litigation on December 17, 2014. (DE #1).

**RESPONSE**: Admitted.

57. Darden was served with Helping Hand's Complaint on December 19, 2014. (DE #14).

**RESPONSE**: Admitted.

58.     Upon learning of the Complaint and flyer at issue, on January 7, 2015, Darden immediately sent Kang and Social Wellness a letter demanding Social Wellness cease and desist in its use of Darden's Olive Garden trademark. (Ex B, Jones Deposition Exhibit 34).

**RESPONSE:** Admitted that Darden sent Kang and Social Wellness a cease and desist letter on January 7, 2015. Denied as to the remaining allegations.

59.     On February 24, 2015, Kang wrote the following email to counsel for Darden:

> Hi, my name is Brian Kang and I am one of the representatives with The Social Wellness Group / Mid Wilshire consulting. This letter is to inform you that Dardens [sic] Restaurants & Olive Garden had nothing to do with the message that was sent to Helping Hands Caregivers LTD. It was totally on the Social Wellness Group just trying to offer a free lecture on health and wellness. If you have any questions please call me back at 213-700-3553.

(Ex. B, Jones Deposition, 88:23-89:24, Jones Deposition Exhibit 35; Ex. C, Kang Deposition, 71:18-72:16).

**RESPONSE:** Denied. Exhibit 35 to the Jones Deposition lacks foundation and is inadmissible. Jones testified that he did not have any role in drafting Exhibit 35. Jones Deposition at 89:17-18, 90:13-14. Kang could not recall whether he or Jones sent the email contained in Exhibit 35, as they both had access to the same Social Wellness email accounts. Kang Deposition at 47:10-12, 71:18-72:16, Ex. 7. Moreover, Kang testified that he spoke with counsel for Darden and that "whatever you guys asked, I did." *Id.* at 46:5-7.

60.     Notwithstanding Darden's cease and desist letter and Kang's email, Social Wellness continued to use the Olive Garden logo without Darden's authorization.  (Ex. E, Darden's Complaint against Helping Hand, ¶30).

**RESPONSE:**   Denied. In response to a question asking Kang when Social

Wellness stopped sending flyers containing the Olive Garden logo, Kang testified, "Once Darden told us to stop using it. We stopped immediately, but sometimes, when the faxes go out, it's like a program. So if they're in circulation, then you can't just stop it." Kang Deposition at 41:11-14; *see also* 80:4-9 (describing how Kang instructed WestFax to stop sending additional faxes bearing the Olive Garden logo after Social Wellness received the cease and desist letter). However, additional faxes were sent by WestFax based upon an order placed prior to the cease and desist letter, and because "they were already in queue." Kang Deposition at 83:5-22.

61.　　For instance, on or about May 6, 2015, Social Wellness sent a fax to a Colorado based company, Biblica, Inc. ("Biblica"), again falsely representing that Olive Garden had teamed up with Social Wellness to offer a free lunch and educational seminar (Ex. E, Darden's Complaint against Helping Hand, ¶31).

**RESPONSE:** Denied. The document cited is hearsay, lacks foundation, and is inadmissible.

62.　　Likewise, on or around May 7, 2015, Social Wellness sent a fax to a Philadelphia based company, Milligan & Company, LLC ("Milligan"), falsely identifying "Olive Garden" as the sender. (Ex. E, Darden's Complaint against Helping Hand, ¶33 and Exhibit G thereto).

**RESPONSE:** Denied. The document cited is hearsay, lacks foundation, and is inadmissible.

63.　　The fax to Milligan again included an unauthorized reproduction of Darden's Olive Garden mark. (Ex. E, Darden's Complaint against Helping Hand, ¶35 and Exhibit G thereto).

**RESPONSE:** Denied. The document cited is hearsay, lacks foundation, and is inadmissible. Moreover, Darden assented to Social Wellness' inclusion of the Olive Garden logo on marketing materials. Jones Deposition, 83:14-16, 93:9-12.

64.     Social Wellness also improperly continued to use the Olive Garden mark on its website. (Ex. E, Darden's Complaint against Helping Hand, ¶¶ 37-38 and Exhibit I thereto).

**RESPONSE:**  Denied. The document cited is hearsay, lacks foundation, and is inadmissible. Moreover, Darden assented to Social Wellness' inclusion of the Olive Garden logo on marketing materials and there was no discussion about whether or not the logo or mark could be displayed on Social Wellness' website. Jones Deposition, 83:14-16, 93:9-12; *see also*, *generally*, Jones Deposition and Bott deposition.

## IX.     DARDEN FILES A COMPLAINT AND OBTAINS A PERMANENT INJUNCTION BASED ON SOCIAL WELLNESS' UNAUTHORIZED USE OF THE OLIVE GARDEN MARK

65.     On June 26, 2015, Darden filed a complaint against Mid Wilshire Consulting, Inc. d/b/a Social Wellness, Social Wellness Group, Social Wellness Foundation, and Brian Kang in the Northern District of Illinois under Case No. 1:15-cv-5716 for trademark infringement under the Lanham Act, federal unfair competition, federal trademark dilution, and violation of the Illinois Uniform Deceptive Trade Practices Act.  (Ex. E, Darden's Complaint against Helping Hand).

**RESPONSE:** Admitted only that Darden filed a complaint on June 26, 2015, containing the allegations stated. The remainder of the statement is denied because the document cited is hearsay, lacks foundation, and is inadmissible.

66.     On July 10, 2015, Darden filed a Motion for Preliminary Injunction and Memorandum in Support. (Exhibit F, Memorandum of Law in Support of Darden's Motion for Preliminary Injunction).

**RESPONSE:** Admitted that Darden filed a motion for preliminary injunction and a memorandum in support of the motion on July 10, 2015.

67.     On July 11, 2015, Kang and Social Wellness were served with Darden's Complaint. (Exhibit G, Kang Proof of Service; Exhibit H, Social Wellness Proof of

Service).

**RESPONSE:** Exhibits G and H speak for themselves; otherwise admitted.

68.    On July 15, 2015, the Honorable Manish S. Shah entered a Preliminary Injunction Order and specifically found that Social Wellness used Darden's registered Olive Garden marks without permission. (Exhibit I, Preliminary Injunction Order, ¶1).

**RESPONSE:** Plaintiff admits that the Honorable Manish S. Shah entered an order on July 15, 2015, on an unopposed motion in a case in which Plaintiff was not a party. The remainder of the statement is denied because the document cited is hearsay, lacks foundation, and is inadmissible.

69.    The Court further ordered the suspension of Social Wellness' website until the removal of the Olive Garden marks. (Ex. I, Preliminary Injunction Order, ¶3).

**RESPONSE:** Plaintiff admits that the Honorable Manish S. Shah entered an order on July 15, 2015, on an unopposed motion in a case in which Plaintiff was not a party. The remainder of the statement is denied because the document cited is hearsay, lacks foundation, and is inadmissible.

70.    On October 20, 2015, the Honorable Manish S. Shah entered a Default Judgment and Permanent Injunction Order. (Exhibit J, Default Judgment and Permanent  Injunction Order).

**RESPONSE:**  Plaintiff admits that the Honorable Manish S. Shah entered an order on October 20, 2015, on an unopposed motion in a case in which Plaintiff was not a party. The remainder of the statement is denied because the document cited is hearsay, lacks foundation, and is inadmissible.

71.    By way of the Default Judgment and Permanent Injunction Order, the Court found Social Wellness and Kang had admitted the relevant facts in Darden's

Complaint, including the acts of willful infringement of the Olive Garden marks. (Ex. J, Default Judgment and Permanent Injunction Order, ¶5).

**RESPONSE:** Plaintiff admits that the Honorable Manish S. Shah entered an order on October 20, 2015, on an unopposed motion in a case in which Plaintiff was not a party. The remainder of the statement is denied because the document cited is hearsay, lacks foundation, and is inadmissible.

72.     Other relevant facts in Darden's Complaint that Social Wellness and Kang admitted include: (a) Social Wellness used the Olive Garden marks without authorization (Ex. J, Default Judgment and Permanent Injunction Order, ¶5; Ex. E, Darden's Complaint against Helping Hand, ¶24); (b) the fax at issue included an unauthorized reproduction of Darden's registered Olive Garden mark (Ex. E, Darden's Complaint against Helping Hand, ¶26); (c) Darden has never approved or authorized Social Wellness to use the Olive Garden marks (id. at ¶40); and (d) Darden has never sponsored or endorsed any goods or services offered by Social Wellness (id. at ¶41).

**RESPONSE:** Plaintiff admits that the Honorable Manish S. Shah entered an order on October 20, 2015, on an unopposed motion in a case in which Plaintiff was not a party. The remainder of the statement is denied because the document cited is hearsay, lacks foundation, and is inadmissible.

73.     The Court permanently enjoined Social Wellness from using the Olive Garden marks and from suggesting any association or affiliation with Darden.  (Ex. J, Default Judgment and Permanent Injunction Order, ¶8(a)-(e)).

**RESPONSE:** Plaintiff admits that the Honorable Manish S. Shah entered an order on October 20, 2015, on an unopposed motion in a case in which Plaintiff was not a party. The remainder of the statement is denied because the document cited is hearsay, lacks foundation, and is inadmissible.

74.     The Court awarded Darden its attorneys' fees and costs in the amount of $28,922.70. (Ex. J, Default Judgment and Permanent Injunction Order, ¶9).

**RESPONSE:** Plaintiff admits that the Honorable Manish S. Shah entered an order on October 20, 2015, on an unopposed motion in a case in which Plaintiff was not a party. The remainder of the statement is denied because the document cited is hearsay, lacks foundation, and is inadmissible.

## X.  SOCIAL WELLNESS HAS A BUSINESS PRACTICE OF USING LOGOS WITHOUT AUTHORIZATION

75.    Darden is not the first company's likeness Social Wellness used without authorization. (Ex. C, Kang Deposition, 74:12-17; Ex. B, Jones Deposition Exhibit 37).

**RESPONSE:**   Denied. The evidence cited merely establishes that Social Wellness has been sued by companies other than Darden for trademark infringement, but there is no admissible evidence as to the remaining facts.

76.    On November 13, 2013, Doctor's Associates Inc. ("DAI"), the owner of the federally registered SUBWAY family of trademarks, filed a lawsuit against Social Wellness and Kang for, among other things, federal trademark infringement and dilution. (*Id.*).

**RESPONSE:** Admitted that Doctor's Associates, Inc. filed a lawsuit on November 13, 2013. The remainder of the statement is denied because the document cited is hearsay, lacks foundation, and is inadmissible.

77.    DAI's lawsuit was based on Social Wellness' unauthorized use of the SUBWAY logo in Social Wellness' "lunch & learn" flyers – the same kind of flyer that is at issue here. (*Id.*; compare Ex. B, Jones Deposition Exhibit 38 with Jones Deposition Exhibit 32).

**RESPONSE**:    Denied because the document cited is hearsay, lacks foundation, and is inadmissible.

78.    Prior to the filing of the DAI lawsuit, Social Wellness, through Kang, agreed to immediately cease and desist from any further use of the SUBWAY family

of trademarks. (Ex. B, Jones Deposition Exhibit 39; Ex. C, Kang Deposition Exhibit 11).

      **RESPONSE:** Admitted.

      79.    As was case in Darden's litigation against Social Wellness, Social Wellness did not contest the allegations in DAI's complaint, and on March 25, 2015, the court entered a Default Judgment permanently enjoining Social Wellness from using the SUBWAY marks, ordering an accounting of Social Wellness' profits, and awarding DAI attorneys' fees and costs. (Exhibit K, DAI Default Judgment).

      RESPONSE: Plaintiff admits that on March 25, 2015, a court entered a default judgment order. The remainder of the statement is denied because the document cited is hearsay, lacks foundation, and is inadmissible.

Dated:  September 27, 2016      Respectfully submitted,

      By: /s/ Julia L. Titolo

      Phillip A. Bock
      Jonathan B. Piper
      Julia L. Titolo
      Bock, Hatch, Lewis & Oppenheim, LLC
      134 N. La Salle St., Ste. 1000
      Chicago, IL 60602
      Tel: (312) 658-5500
      Fax: (312) 658-5555
      phil@classlawyers.com
      jon@classlawyers.com
      julia@classlawyers.com

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on September 27, 2016, s/he caused a true and correct copy of the foregoing *Plaintiff's Response to Defendant Darden Restaurants, Inc.'s Statement of Uncontested Material Facts* to be electronically filed with the Clerk of Court using the Court's CM/ECF system, which automatically sends a notice of electronic filing to all counsel of record, and served by U.S. Mail the following entity and individuals who have not filed an appearance in this case:

Mid Wilshire Consulting, Inc.
c/o Brian J. Kang
3550 Wilshire Blvd. 105-60
Los Angeles, CA 90010

Brian J. Kang
3550 Wilshire Blvd. 105-60
Los Angeles, CA 90010

Greg M. Jones
4110 Cougar Canyon Rd
Hemet, CA 92545

/s/ Julia L. Titolo