CERTIFIED COPY

A True Copy

Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 17-1282

HELPING HAND CAREGIVERS, LTD.,

*Plaintiff-Appellant*,

*v.*

DARDEN RESTAURANTS, INC., *et al.*,

*Defendants-Appellees*.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:14-cv-10127 — **Manish S. Shah**, *Judge*.

———————————

ARGUED DECEMBER 5, 2017 — DECIDED AUGUST 14, 2018

———————————

Before WOOD, *Chief Judge*, and ROVNER and HAMILTON,
*Circuit Judges*.

ROVNER, *Circuit Judge*. Helping Hand Caregivers, Ltd.,
("Helping Hand") filed a suit against Darden Restaurants,
Inc., Mid Wilshire Consulting, Inc. ("Mid Wilshire"), Brian
Kang, and Greg Jones, alleging a violation of the Telephone
Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. Specifi-
cally, Helping Hand asserted that Mid Wilshire, through
Kang and Jones, sent an unsolicited fax advertisement to

Helping Hand on behalf of Darden. The district court grant-
ed Darden's motion for summary judgment and dismissed
the claims against the remaining defendants without preju-
dice. Helping Hand subsequently stipulated that the dismis-
sals against the remaining defendants should be treated as
dismissals with prejudice, and therefore the decision was
final and appealable. Helping Hand now appeals the grant
of summary judgment to Darden, arguing that the district
court applied the wrong legal standard in granting summary
judgment and that the court erred in limiting discovery and
denying its motion under Federal Rule of Civil Procedure
56(d).

The district court relied upon the undisputed facts (in-
cluding facts that were not properly disputed) in its grant of
summary judgment, and we include those relevant facts as
set forth by the district court here. Brian Kang was the CEO
and sole employee of Mid Wilshire, doing business as Social
Wellness. Jones worked as an independent contractor on be-
half of Social Wellness, which set up "Lunch 'n Learn" op-
portunities for doctors to provide wellness presentations at
companies. At those presentations, the doctors would pre-
order food for attendees, and on behalf of Social Wellness,
Jones contacted Darden Restaurants, Inc.—the owner of cer-
tain Olive Garden trademarks—to explore a strategic alli-
ance. Specifically, Jones sought permission from Darden to
use the Olive Garden logo in its advertising to promote So-
cial Wellness's programs by offering Olive Garden food to
attendees. Jones handled all communications between Social
Wellness and Darden, and Kang never communicated with
anyone at Darden.

A series of email and phone communications ensued between Jones and various persons at Darden. Initially, Jones communicated with Kasha Momot, who was the then-Director of Brand Management at Darden. Momot and Jones exchanged emails and spoke once or twice by phone beginning in July 2014, and Jones also communicated with Ken Bott, the Director of Commerce Programs and Partnerships for Darden. A month or two after the initial email with Jones, Momot left Darden for employment elsewhere. After Momot's departure, Jones communicated primarily with Bott.

A series of emails and possibly phone calls took place beginning in early September 2014 between Jones and Bott, in which the marketing possibilities were discussed in more detail. In those communications, Jones proposed a marketing plan in which Social Wellness would engage in email marketing, first by sending emails to a test group informing people where the food was purchased for the wellness presentations, and in that way Social Wellness could determine whether incorporating the Olive Garden name resulted in a greater interest in enrollment in Social Wellness's programs. Jones sent Darden a mock-up email using a different company's logo, although no mock-up of the exact email using an Olive Garden logo was ever proposed.

Jones also had contact with another employee of Darden, Roberto Sanchez, at one point. Jones contacted Bott because some doctors had problems ordering online from Olive Garden, and Bott asked Sanchez to help Jones with the online ordering process. Thereafter, Sanchez spoke with Jones by phone and sent Jones an "Online Ordering Guide."

No advertising medium other than email was ever discussed in the communications regarding the potential marketing plan between Darden and Social Wellness. Despite that, Social Wellness engaged in a marketing effort by fax, using the Olive Garden logo on a flyer that was created using Photoshop by a person who Kang and Jones found on Craigslist. Kang and Jones obtained the Olive Garden logo and a picture of food through Google searches and/or an online company selling photos—not from Darden—and included that logo and picture on the flyer. The flyer stated that Social Wellness was teaming up with Olive Garden for a "Lunch n' Learn" and that a complimentary catered lunch would be provided. All contact information in the flyer such as the email address and phone number was for Social Wellness. The flyer was faxed to fax numbers that Social Wellness had obtained from a Google search and from a list purchased from a person on Craigslist. Bott never saw the flyer prior to its distribution, and Jones admitted that he never discussed with Darden the possibility of sending faxes and that only email marketing was discussed.

The marketing by fax was also inconsistent with Darden's practices. Darden generally does not market by fax, nor is its practice to enter into partnerships without a number of protections. Specifically, Darden's practice in entering into partnerships is to require senior management to sign off, and to utilize written agreements including a master services agreement and statement of work outlining logo usage and business expectations, as well as a nondisclosure agreement. Social Wellness and Darden never entered into any contract together and did not pay each other any money. Regarding the authorization to use the Olive Garden logo, Bott maintains that no permission was ever given, and Jones

asserts only that "Bott told him Darden had 'no problem with your telling your companies where the food is coming from.'" Dist. Ct. Mem. Op. and Order 12-21-2016 at 5.

That faxed flyer was received by Helping Hand Caregivers, Ltd., on October 31, 2014, and it filed suit against Darden, Social Wellness, Kang, and Jones on December 17, 2014, alleging that the faxed advertisement violated the TCPA. That Act addresses in part the problem of unsolicited fax advertisements which result in the unwanted cost to the recipient in terms of impeding access to their fax machine for business uses and in the cost of operation of the machine.

Darden then sent a cease-and-desist letter to Kang and Social Wellness demanding that they cease using Darden's Olive Garden trademark. Social Wellness responded with an email to Darden's counsel from Kang in which he stated that "[t]his letter is to inform you that Dardens [sic] Restaurants & Olive Garden had nothing to do with the message that was sent to Helping Hand Caregivers LTD. It was totally on the Social Wellness Group just trying to offer a free lecture on health and wellness."

Darden subsequently sued Social Wellness and Kang for trademark infringement, alleging that it had continued to use the Olive Garden trademarks in faxes sent to third parties. Social Wellness did not appear in the lawsuit, and Darden obtained a default judgment and permanent injunction in the matter. The district court's order found that, by default, the relevant facts in the complaint were admitted including willful infringement of the Olive Garden trademarks.

In its TCPA action, Helping Hand served all defendants but only Darden appeared. Social Wellness, Kang, and Jones did not appear, and Helping Hand did not move for class status nor did it seek to hold them in default. Helping Hand sought numerous depositions, including from Darden employees Bott and Sanchez and former employee Momot. The district court allowed the deposition of Bott, but to avoid conducting depositions without all parties to the case, stayed further depositions of Darden employees until Helping Hand brought forward a plan either to bring the remaining defendants into the case or to pursue a default judgment. Helping Hand proceeded to depose Bott, Kang and Jones. After those depositions, the court declined to lift the stay on further depositions after Helping Hand indicated that it still had no plan either to bring those defendants into the case or to move for default judgment. Darden then moved for summary judgment, and in response to the motion for summary judgment, Helping Hand filed a motion under Rule 56(d) requesting that the stay be lifted so that it could depose Momot and Sanchez. The court denied that stay request, however, holding that Helping Hand failed to explain how depositions of either person would add information that was not available from Jones, Kang, or Bott, all of whom Helping Hand had already deposed, and granted summary judgment in favor of Darden against the plaintiff.

In this appeal, Helping Hand challenges the grant of summary judgment against it on two grounds. On the merits, it argues that the court erred in its application of agency law in granting summary judgment. It also argues that the court erred in refusing to lift the stay of the depositions and in refusing to grant the Rule 56(d) motion.

We turn then to Helping Hand's challenge to the legal principles applied by the district court. In granting summary judgment to Darden, the court reasoned that Helping Hand had failed to show that Social Wellness acted as Darden's agent in that it had express, implied, or apparent authority from Darden to send faxes on its behalf. Helping Hand asserts that the court erred in relying on agency principles, and that the language of the statute and regulation instead establishes that Darden can be directly liable if it benefitted from the promotion in the advertisement regardless of whether it authorized it.

The statute at issue provides that it is unlawful "to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement," unless it fell within one of the exceptions such that the sender has an established business relationship with the recipient, the recipient made its fax number available through specified means, or the unsolicited advertisement contained a notice meeting certain statutory requirements. 47 U.S.C. § 227(b)(1)(C); *Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 938 (7th Cir. 2016). The regulations have defined the "sender" as "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(10).

Helping Hand focuses on the language in the second clause of the regulation—which defines a sender to include "a person or entity … whose goods or services are advertised or promoted in the unsolicited advertisement." *Id*. It argues that the provision lacks the "on whose behalf" language of the first clause, and therefore imposes a direct lia-

bility standard for anyone whose goods or services were promoted in the advertisement. Under that provision, it argues, Darden is liable for any advertisement of Olive Garden regardless of whether the advertisement was sent on its behalf or with its authorization. Helping Hand contends that Darden and Social Wellness entered into a "strategic alliance" with Social Wellness whereby Darden benefitted from the faxes sent by Social Wellness, in that Olive Garden received more business following the fax, and therefore it is liable under the second clause of the regulation. Helping Hand points to decisions of other circuits, *Palm Beach Golf Ctr.–Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245 (11th Cir. 2015), and *Siding and Insulation Co. v. Alco Vending, Inc.*, 822 F.3d 886 (6th Cir. 2016), as consistent with its interpretation of TCPA liability under the regulation.

In *Clark*, we considered the same statute and regulation and rejected an interpretation which would hold an entity strictly liable if its goods or services were advertised in a fax regardless of its authorization of such advertisement. 816 F.3d at 938. We reaffirmed that holding in *Paldo Sign & Display Co. v. Wagener Equities, Inc.*, 825 F.3d 793, 797 (7th Cir. 2016), noting that under a strict liability approach, a competitor could send out thousands of unsolicited facts promoting another company's goods or services, thereby bankrupting that company, even though the company played no part in sending or authorizing the faxes. *Id*. We noted that "[a]lthough the literal language of the regulation suggests that such a result is possible, … to be liable as a sender, a person must have done something to advertise goods or services." *Id*. Therefore, in both *Clark* and *Wagener* we held that agency rules should be applied to determine whether the ac-

tion was done on behalf of a principal. *Clark*, 816 F.3d at 938; *Wagener*, 825 F.3d at 797.

Although Helping Hand argues that those holdings are inconsistent with other circuit decisions, that argument does not withstand scrutiny. In *Palm Beach Golf Center*, the Eleventh Circuit held that a person whose services are advertised in an unsolicited fax transmission could be held liable directly under the TCPA so long as the advertisement was sent "on its behalf." 781 F.3d at 1254. Thus, that decision is consistent with our recognition that liability attaches only as to those persons and entities on whose behalf the unsolicited fax is sent.

The Sixth Circuit's decision in *Alco Vending* included language interpreting the second clause of the regulation as imposing a strict liability standard, but it held that the conduct in that case preceded the addition of that language and therefore did not impose that standard in its case. 822 F.3d at 891–92. In a subsequent decision, however, *Health One Medical Center, Eastpointe P.L.L.C. v. Mohawk, Inc.,* 889 F.3d 800 (6th Cir. 2018), the Sixth Circuit addressed a case that is factually analogous to this one, and rejected the strict liability standard. In that case, Mohawk Medical, a pharmaceutical wholesaler, sent unsolicited faxes to medical providers advertising its prices for various drugs. *Id*. at 801. In addition to suing Mohawk Medical, from whom it obtained a default judgment, a medical provider sued Bristol-Meyers Squibb and Pfizer based on the theory that they had "sent" the faxes for purposes of the TCPA because drugs that they manufactured were among the ones for which discounted pricing was advertised in the faxes. *Id*. The Sixth Circuit looked to the language of the statute itself which requires that a person

"use any … device to send, to a telephone facsimile machine, an unsolicited advertisement." *Id*.; 42 U.S.C. § 227(b)(1)(C). The court held that by its language, therefore, the statute requires that a defendant must "send" an advertisement, and the common meaning of send is either to cause to be conveyed or to dispatch. *Mohawk*, 889 F.3d at 801. The court held that the defendants neither caused the faxes to be conveyed nor did they dispatch them, and therefore could not be liable under the statue. *Id*. The court held that the regulation must be read in the context of the statutory text it implements, and therefore could not be read as expanding liability to a person or entity who could not be characterized as a sender. *Id*. at 802. The court held that *Alco Vending* could not be read as holding that "an innocent party—like Bristol or Pfizer here— could by some legal alchemy be held liable for having 'sent' the faxes." *Id*. Therefore, after *Mohawk* it is clear that the Sixth Circuit interpretation of the statute is not inconsistent with our caselaw recognizing that a defendant who has no connection whatsoever to the sending of the fax cannot be held liable under the TCPA.

That is the clear import of the plain language of the statute. Nothing in the statute allows the imposition of liability on an entity wholly unaware of the use of its logo in a fax. The interpretation adopted by this circuit in *Clark* and *Wagener* is proper, and there is no reason for us to depart from it now.

Under that standard, Helping Hand could demonstrate liability if it produced evidence that Social Wellness had express actual authority to send the fax on Darden's behalf, or even if it had implied actual authority or apparent authority. *Clark*, 816 F.3d at 938. Helping Hand has failed to provide

any such evidence. At best, it provided testimony that Darden and Jones, representing Social Wellness, engaged in discussions regarding a joint marketing plan to involve the sending of emails. No written or digital correspondence, or testimony, indicates any discussion of fax advertising. In fact, Jones—who was responsible for sending the fax advertisement—acknowledged that there was never any discussion with Darden of sending fax advertisements. Helping Hand fails in its arguments to distinguish the type of marketing discussed, but of course the type of marketing is precisely the issue that implicates TCPA liability. Email marketing does not run awry of the TCPA; the relevant question here is whether there were any communications that would indicate an authorization to send a fax advertisement, and as to that issue Jones and Bott are in agreement that fax advertisements were not discussed or approved, and no written or testimonial evidence allows for a contrary inference.

Helping Hand asserts, however, that the lack of such evidence is a result of the district court's refusal to allow it to depose two witnesses—Kasha Momot and Roberto Sanchez—and that the court erred in refusing that discovery and in denying its subsequent motion under Federal Rule of Civil Procedure 56(d). Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." As Helping Hand acknowledges, we review discovery decisions of the district court only for abuse of discretion. *Kuttner v. Zaruba*, 819 F.3d 970, 974 (7th Cir. 2016). Moreover, "'[a] trial judge's decision to consider a defendant's motion for sum-

mary judgment before allowing the plaintiff to depose certain witnesses is a discovery matter, which we review under the abuse of discretion standard.'" *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 885 (7th Cir. 2005), quoting *Grayson v. O'Neill*, 308 F.3d 808, 815–16 (7th Cir. 2002). We will affirm such determinations unless the court's ruling lacks any basis in law or fact or clearly appears to be arbitrary. *Kuttner*, 819 F.3d at 974.

Both Momot and Sanchez had conversations with Jones, although the timing and nature of their communications render them lesser players in the discussions than Bott, who was deposed. Sanchez was consulted by Jones only to assist in the online ordering process, and nothing in the documents or testimony in this case implies an involvement in the marketing discussions. And Momot was not an employee of Darden for the communications with Jones which immediately preceded the fax advertisement, as she left Darden in early September 2014. Jones pointed only to his discussions with Bott as the basis for his belief that he could send the advertisements with the Olive Garden logo, and both Bott and Jones were deposed. The contention that Momot or Sanchez could provide relevant testimony thus necessarily rests on the notion that Jones was provided the authorization to engage in fax advertising but did not remember it or that he lied about it, because Jones—who sent the fax advertisements—testified by deposition that he never discussed fax marketing with anyone at Darden.

We have held that a district court does not abuse its discretion in denying additional discovery "where the request 'was based on nothing more than mere speculation and would amount to a fishing expedition.'" *In re Dairy Farmers*

*of America, Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 766 (7th Cir. 2015), quoting *Davis*, 396 F.3d at 885. The mere hope, without more, of revealing a "smoking gun" is insufficient to support unbounded discovery. See *id*. We need not determine whether the discovery request in this case rested on more than a speculative hope of evidence, however, because the district court's discovery determination must be upheld on a more fundamental ground.

The district court in this case did not deny the plaintiff the ability to take the depositions of Momot and Sanchez in this case; the court merely required the plaintiff to proceed on a course of action as to the other defendants before taking such depositions. At the time of the deposition request, Momot was no longer an employee of Darden. Sanchez was an employee but as mentioned above was tasked with helping with the online ordering system and there is no indication that he had any involvement in marketing issues. The district court in August 2015 stayed the depositions as to those persons because three of the four defendants in the case had yet to appear although they had been served, and the plaintiff was unable to tell the court what its plan was to either bring those defendants into the action or move for default as to them. The court expressed the same concerns at subsequent hearings in October 2015 and June 2016 when Helping Hand again asked the court to lift the stay of depositions. Helping Hand once again was unable to inform the court as to any plan with respect to those defendants to either bring them into or remove them from the case.

Decisions by a district court to cut off or limit discovery so as to avoid piecemeal litigation fall squarely within the management province of the district court. *Kallal v. CIBA*

*Vision Corp.*, 779 F.3d 443, 446–47 (7th Cir. 2015). Here, the court properly was concerned with the expansion of depositions prior to a determination as to whether the plaintiff would proceed with its case against the remaining defendants. Its determination to stay further depositions was a reasonable means of streamlining discovery, encouraging prosecution of the case, and avoiding duplication in discovery which would occur if the defendants subsequently appeared in the case and sought the same depositions. The power to obtain the depositions in this case rested squarely with Helping Hand—with the court requiring Helping Hand only to reveal a plan either to seek default or to otherwise proceed against the remaining defendants. It was an insubstantial burden, but one that Helping Hand chose to ignore. It now argues that it did not want to seek default because it would impede its likelihood of obtaining class status, but it did not present that justification to the district court and did not move for class status despite having completed depositions as to the main parties to the marketing conversations. We consistently have upheld the district court's discretion to manage its cases and control discovery, and do so here. See *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1082 (7th Cir. 2016) ("[a] party who fails to comply with deadlines related to discovery or otherwise forestalls prosecution of their own case is not entitled to seek additional discovery when the opposing side moves for summary judgment."); *Olivieri v. Rodriguez*, 122 F.3d 406, 409 (7th Cir. 1997) ("[p]retrial discovery is time consuming and expensive; it protracts and complicates litigation; and judges are to be commended rather than criticized for keeping tight reins on it."). Where the failure to secure discovery is due to a party's own lack of diligence,

the district court can in its discretion hold the party to the consequences of its choice and decide the summary judgment motion. See, e.g., *Davis*, 396 F.3d at 886; *Flint v. City of Belvidere*, 791 F.3d 764, 768 (7th Cir. 2015). Here, Helping Hand chose to ignore the remaining defendants despite the court's repeated determination that it could not proceed with those depositions until it formulated a plan to address those other defendants so as to ensure a manageable discovery procedure. Its lack of diligence in responding to the court's concerns and addressing that issue left it with the consequence of an inability to take those depositions prior to the disposition of the summary judgment motion. The district court did not abuse its discretion in its case management decision that had been clearly communicated to Helping Hand and its holding Helping Hand to its own choices, particularly where the only action requested of Helping Hand was to inform the court as to its plan to address the prosecution of the case against the remaining defendants.

Accordingly, the decision of the district court is AFFIRMED.